IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF THE STATE OF TEXAS,

ABILENE DIVISION

| | | |
|---|---|---|
| TSEPHANYAH Y. HAWKINS, | § | JURY TRIAL DEMANDED |
| YAHCHANAN Y. HAWKINS, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § |  |
| | § | |
| WHITTEN & YOUNG, P.C., | § | |
| CLAUDIA M. HUTCHISON, in her | § | |
| personal capacity and in her capacities | § | |
| with StenoScribe, Incorporated, Vocedit, | § | |
| Inc. | § | |
| NORMAN M. OSTER, in his personal | § | Civil Action No. 1-05CV-184C |
| capacity and in his capacities with | § | |
| StenoScribe, Incorporated, Vocedit, Inc., | § | |
| STENOSCRIBE, INCORPORATED, | § | |
| THE NATIONAL INSTITUTE OF | § | |
| REALTIME REPORTERS, INC., | § | |
| VOCEDIT, INC., | § | |
| CHARLES C. SELF III, | § | |
| DONALD L. ANDERSON JR., | § | |

1

Defendants

§
§
§
§
§
§
§
§
§
§
§
§
§

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Tsephanyah Y. Hawkins, and Yahchanan Y. Hawkins, for their Second

Amended Complaint against defendants Whitten & Young, P.C., Claudia M. Hutchison, Norman

M. Oster, The National Institute of Realtime Reporting, Inc., StenoScribe, Incorporated, Vocedit,

Inc., Charles C Self III, Donald L. Anderson, Jr., state as follows:

### Jurisdiction and Venue

1. The Court has jurisdiction over the subject matter of this action under 18 U.S.C §1595, which

permits civil actions by victims of a violation of the forced labor provisions of the Victims of

Trafficking and Violence Protection Act of 2000.

2. The Court has jurisdiction over the subject matter of this action under 28 U.S.C § 1331,

which states that district courts shall have original jurisdiction of all civil actions arising under

the Constitution, laws, or treaties of the United States.

3. The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1343

which permits civil actions by any person to recover damages for injury to his person or property

because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42; to recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent; To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

4.   Additionally or in the alternative, this action is brought under the federal Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961, *et seq.*

5.   Plaintiff's claims brought under Texas or Massachusetts, or Pennsylvania, or South Carolina law are so related to Plaintiff's federal claims, over which the Court has original jurisdiction, that they form part of the same case or controversy.  Under Article III of the United States Constitution, the Court has jurisdiction over Plaintiff's Pennsylvania, Texas, Massachusetts, and South Carolina common law and statutory claims pursuant to 28 U.S.C. § 1367.

6.   A substantial part of the events and omissions giving rise to the claims stated herein occurred in this District, a substantial part of the property that is the subject of this action is situated in this District, and at least one defendant is found in this District and there are no districts wherein all defendants are found.  Venue is proper in this District and Division pursuant to 28 U.S.C. §§ 1391(b)(2) and (3) and pursuant to 18 U.S.C. § 1965(b).

### Non-Parties

3

7.   On information and belief, Chistolini and Desimone, P.C., herein after referred to as "C&D", is a corporation formed under the laws of Massachusetts and based in Massachusetts.  It is a law firm.  The location of its principal office is 20 McGrath Highway, Quincy, Massachusetts.

8.   On information and belief, Carter Law Offices, herein after referred to as "Carter Law Offices", is a law firm based in Texas.  The location of its principal office is 618 Hickory, Abilene, Texas.

9.   Based upon information and belief, John Chistolini, hereinafter referred to as "Chistolini" is an individual who presently resides in Massachusetts.  In the acts described in the complaint below, he played many roles.  He was employed at some relevant times as an attorney or otherwise by NIRR.  In many of the acts alleged herein, Chistolini acted within the scope of his authority and employment by NIRR.  His acts in furtherance of the scheme enriched NIRR and himself.   Along with other actions that caused damage to Plaintiffs, Chistolini also conspired with defendants in this case including but not limited to state actor Weeks, and state actor Hutchison to deprive plaintiffs of rights, privileges or immunities guaranteed by the Constitution or laws of the United States, thereby causing damage and/or injury to Plaintiffs.   At all relevant times Chistolini was acting in the ordinary course of business of Chistolini and Desimone, Inc..He is an officer and partner with that firm. He acted with the authority of partners with the firm.

10. Based on information and belief, Marilyn Gardner, herein referred to as "Gardner" is an individual who presently resides in Massachusetts.  She is employed by NIRR as its president. She is also an attorney.  Gardner was at relevant times an agent of NIRR.  In many of the acts alleged herein, Gardner acted within the scope of her authority and employment as an employee of NIRR.  Her acts in furtherance of the schemes described in this complaint enriched both NIRR

and herself.   Along with other actions that caused damage to plaintiffs, Gardner also conspired

with defendants and non-parties in this case including but not limited to state actor Weeks, and

state actor Hutchison to deprive Plaintiffs of rights, privileges or immunities guaranteed by the

Constitution or laws of the United States, thereby causing damage and/or injury to plaintiffs.

11. Courtroom Data Solutions, Inc., hereinafter referred to as "CDS" is a corporation organized

under the laws of Texas whose principal place of business is 3706 Private Road 2547, Clyde,

Texas.  It underwent a name change in late 2003, and was previously known as "StenoScribe,

Inc." Since its formation in 1997, CDS is engaged in the business of manufacturing, engineering,

marketing, sales, training in the use, and support of computerized court reporting systems,

software, and hardware.

12. On information and belief, The South Carolina School of Court Reporting, Inc. hereinafter

referred to as SCSCR is a corporation formed under the laws of the state of South Carolina with

its principal place of business in South Carolina.  Upon information and belief, SCSCR is

engaged in the business of marketing, sales, training in the use, and support of computerized

court reporting systems, software, and hardware, and has been at all relevant times.

13. On information and belief, S. A. W. Solutions, Inc. hereinafter referred to as "SAW" is a

corporation formed under the laws of the state of Pennsylvania with its principal place of

business in Pennsylvania.  Upon information and belief, SAW is engaged in the business of

marketing, sales, training in the use, and support of computerized court reporting systems,

software, and hardware, and has been at all relevant times.  Those activities are carried on under

or through the fictitious name DigiWare Technologies, Inc.

14. On information and belief, The Honorable John W. Weeks, hereinafter referred to as

"Weeks" is an individual who presently resides in Abilene, Texas.  He is employed as a State of

Texas District Court Judge, and has been during all relevant events. Along with other actions that caused damage and/or injury to plaintiffs, Weeks violated Plaintiffs' civil rights by actions he took under color of state law, and thereby deprived Plaintiffs of rights, privileges or immunities guaranteed by the Constitution or laws of the United States, thereby causing damage and/or injury to Plaintiffs. At all relevant times he was acting as a State of Texas District Court Judge.

15.   On Information and belief, Victoria L. Carter, herein referred to as "Carter" is an individual who presently resides in Abilene, Texas. She is employed as an attorney. From late 2003 until July 2005 she was employed as Hutchison's attorney. Along with other acts that caused damage to Plaintiffs, Carter also conspired with defendants and non-parties in this case including but not limited to state actor Weeks and state actor Hutchison to deprive plaintiffs of rights, privileges or immunities guaranteed by the Constitution or laws of the United States, thereby causing damage and/or injury to plaintiffs. At all relevant times Carter was acting in the ordinary course of business and with the authority of the Carter Law Firm of which she is an owner.

### The Parties

16. Plaintiff Tsephanyah Y. Hawkins, hereinafter referred to as "Tsephanyah Hawkins" is an individual. He presently resides in Clyde, Texas and has during all relevant events. He was born in Boston, Massachusetts and is a citizen of the United States of America and has been his entire life. In 1996 he changed his name from Russell K. Owen Jr. to Tsephanyah Yisrayl Hawkins for the purpose of giving honor to the Creator Yahweh. He is employed as a computer programmer and businessman. Since the organizational meeting of CDS in 1997, he has been the sole officer of CDS, the sole shareholder of CDS, the sole director of CDS, and its sole registered agent. He is the sole incorporator of CDS. He has never been convicted of a crime.

6

17. Plaintiff Yahchanan Y. Hawkins, hereinafter referred to as "Yahchanan Hawkins" is an individual. He presently resides in Clyde, Texas and has during all relevant events. He was born in Massachusetts and is a citizen of the United States of America and has been his entire life. In 1996 he changed his name from John Joseph Owen to Yahchanan Hawkins for the purpose of giving honor to the Creator Yahweh. He has never been convicted of a crime.

18. On information and belief, Defendant StenoScribe, Incorporated, hereinafter referred to as "SS" (to avoid confusion with CDS, formerly known as StenoScribe, Inc.) is a corporation formed on or about October 23, 2003 under the laws of the state of Texas with its principal place of business in Texas. Upon information and belief, at all relevant times SS engaged in the business of marketing, sales, training in the use, and support of computerized court reporting systems, software, and hardware.

19. On information and belief, Defendant Claudia M. Hutchison, herein referred to as "Hutchison" is an individual who presently resides in South Carolina. From 1997 to October 7, 2003 she performed sales work, typing, bookkeeping, instruction, support, and various other tasks for plaintiff CDS. She never held shares in CDS, she was never an officer of CDS, nor a registered agent of CDS, and she was never a director of CDS. She is currently employed as a court reporter, instructor, and, from information and belief, is an officer, agent, representative, or employee of several corporations established in various states including but not limited to SCSCR, SAW, and/or SS. Along with other acts that caused damage to Plaintiffs, Hutchison also criminally conspired with defendants and non-parties in this case including but not limited to state actor Weeks who acted under color of law to violate plaintiffs' rights. Those rights violations caused damaged or injury to Plaintiffs. In the acts described in the paragraphs below,

7

she played many roles.  Hutchison is being sued personally and in her capacities with

StenoScribe, Incorporated, and Vocedit, Inc.

20. Hutchison was at relevant times an agent of StenoScribe, Incorporated, and Vocedit, Inc.  At

relevant times, Hutchison acted within the scope of her authority and employment as an

employee and/or agent of StenoScribe, Incorporated, and Vocedit, Inc.  By her actions described

below, she enriched herself and StenoScribe, Incorporated, and/or Vocedit, Inc.

21. Hutchison was at all relevant times engaged in the business of marketing, sales, training in

the use, and support of computerized court reporting systems, software, and hardware.  She

carried on those activities under or through the fictitious name StenoScribe and/or Claudia

Hutchison DBA StenoScribe.

22. Hutchison is sued individually and in her capacities with StenoScribe, Incorporated, and

Vocedit, Inc.

23. On information and belief, Defendant Norman M. Oster, herein referred to as "Oster" is an

individual who presently resides in South Carolina.  He is employed as an instructor.  Along with

other actions that caused damage to Plaintiffs, Oster also conspired with defendants and non-

parties in this case including but not limited to state actor Weeks, and state actor Hutchison, to

violate plaintiffs' civil rights, depriving plaintiffs of rights, privileges or immunities guaranteed

by the Constitution or laws of the United States, thereby causing damage and/or injury to

plaintiffs.  Oster goes by the aliases Qanayah Hawkins, Norman Hawkins, and Qanayah Oster.

In the acts described in the paragraphs below, he played many roles.  At relevant times Oster was

an agent for Hutchison, and SS, and/or Vocedit, Inc.  He is sued personally and in his capacities

with SS, Inc. and Vocedit, Inc.

8

24. On information and belief, Defendant The National Institute of Realtime Reporting, Inc., herein after referred to as NIRR, is a corporation formed under the laws of Massachusetts and based in Massachusetts.  The location of its principal office is 220 Forbes Rd., Suite 302, Braintree, Massachusetts 02186.   Prior to the May 5, 2005 adoption of its current name, NIRR was known as The New England School of Court Reporting, Inc.  It is engaged in the business of marketing, sales, training in the use, and support of computerized court reporting systems, software, and hardware.

25. Charles C. Self III, hereinafter referred to as "Self" is an individual who presently resides in Texas.  From on or about October 17, 2003 to on or about November 1, 2004, he represented Tsephanyah Hawkins and CDS in the state lawsuit number 18,093 in the 42nd District Court of Callahan County, Texas.  At all relevant times Self was acting in the ordinary course of business of  Whitten and Young, P.C. and/or with authority of partners with the firm. He is a shareholder and officer at Whitten and Young, P.C.

26. Donald L. Anderson Jr., hereinafter referred to as "Anderson" is an individual who presently resides in Texas.  Beginning on or about November 1, 2003 he entered into an attorney-client relationship with Tsephanyah Hawkins and CDS in the state lawsuit number 18,093 in the 42nd District Court of Callahan County, Texas.  He is a partner or shareholder at Whitten and Young, P.C., He is an officer of Whitten and Young, P.C.  At all relevant times Anderson was acting in the ordinary course of business of Whitten and Young, P.C.and/or with the authority of partners with the firm.

27. On information and belief, Vocedit, Inc. is a corporation whose principal place of business is South Carolina.  It is hereinafter referred to as "Vocedit".   It is a corporation formed under the laws of Texas.

28. On information and belief, Defendant Whitten and Young, P.C., herein after referred to as "Whitten and Young", is a corporation formed under the laws of Texas and based in Texas. It is a law firm. The location of its principal office is 500 Chestnut Street, Suite 1402, Abilene, Texas.

## FACTS

29. In 1993, Tsephanyah Hawkins became a member of The House of Yahweh. The House of Yahweh is a religious organization with a membership population of something significantly less than two percent of the Big Country's population and less than one one hundredth of one percent of the population of the United States of America. Members of The House of Yahweh hold core beliefs that directly contradict core beliefs of Christianity. Those beliefs include but are not limited to the following:

    a.  Laws of the bible must be kept;

    b.  A failure to keep them always leads to negative consequences (curses);

    c.  The Savior did not do away with the laws, rather, he kept and taught them

    d.  The Savior's name is not "Jesus", it is "Yahshua".

    e.  The Creator's name is not "God", it is "Yahweh".

30. Because these beliefs directly contradict beliefs held by individuals of other religions, many find them intolerable; and that intolerance often leads to an invidiously discriminatory animus directed towards members of The House of Yahweh.

31. In the early to mid 1990s, Tsephanyah Hawkins developed a computerized court reporting system and started CDS to market it, provide training in its use, and technical support for its users. CDS was incorporated by Tsephanyah Hawkins in May of 1997 and initially named

10

Voicewriter Systems, Inc.  In August of 1997 it changed its name to StenoScribe, Inc.  In late 2003, it changed its name to Courtroom Data Solutions, Inc.

32. CDS utilized the services of Hutchison to sell, market, and support its products.  She also answered the phones, trained users, and performed general office help including bookkeeping and typing.

33. On or about August of 2003, NIRR agreed to purchase twenty computerized court reporting systems from CDS.  The systems, marketed by CDS under the trade name "Techlennium", without the notebook computer sold for $3999.00 per system.  CDS was also to lend NIRR two loaner systems for instructors.   Because they were to receive a $500.00 student discount for each system and two loaner systems, NIRR agreed to prove that the students were, in fact, students, and that the teachers using loaner systems were, in fact, teachers.   NIRR was to resell the systems to its students for use in NIRR's courses and for later professional use by the student.  For obvious reasons including but not limited to reasons related to technical support and to verify that the systems were, in fact being sold to students or used by teachers, NIRR agreed to provide to CDS the names and addresses of the individuals purchasing, or borrowing (the instructors) the systems from NIRR.

34. It was represented by NIRR through its representative Gardner that NIRR would purchase twenty Techlennium systems every other month, however, the terms of those purchases would depend upon the speed with which NIRR paid for the first twenty systems (worth about $80,000.00 before student discounting), and NIRR's compliance with purchaser and borrower reporting requirements.

35. Prior to the September of 2003 shipment of the first twenty Techlennium systems, NIRR represented to CDS that over half of the twenty systems would be paid in full by October 1st,

2003. It was based upon a reliance of that representation that CDS agreed to make the first shipment. When October 1, 2003 arrived, only three of the twenty systems were paid for—$10,500.00 of the $70,000.00. The financials of that situation made it impossible and/or unwise for CDS to agree to make another shipment under similar terms.

36. Tsephanyah Hawkins informed Hutchison that he was dissatisfied with the payments being made by NIRR, and that it would be unlikely that he would approve another order unless it was prepaid or the payment otherwise assured to his satisfaction.

37. CDS did not approve another order from NIRR.

*Hutchison Steals $7000.00 Check*

38. On October 7, 2003, CDS's president Tsephanyah Hawkins was informed by Hutchison that she was in possession of a $7000.00 check from NIRR belonging to CDS. That check was a partial payment for a shipment to NIRR that was shipped the month prior by CDS. Plaintiffs believe and hereby allege that Hutchison caused Gardner, or Chistolini, or other agent of NIRR to mail the check to an address other than the usual Abilene, Texas post office box address used by CDS in order that Hutchison could gain possession of that check. In the alternative, Hutchison, and Gardner, and Chistolini agreed to send the check to Hutchison in order to keep the check from Tsephanyah Hawkins, or Hutchison, and Gardner, and Chistolini agreed to send the check to Carter in order to keep the check from Tsephanyah Hawkins, and in order to obtain it for themselves. As of the filing of this complaint, CDS has never received the check, and NIRR still owes that money to CDS along with the balance for Techlennium systems shipped to them by CDS.

39. Tsephanyah Hawkins verbally demanded the check from Hutchison. In response to his demand, he was informed by Hutchison that the check was in the possession of "her attorney."

Tsephanyah Hawkins informed Hutchison that the check was needed to pay CDS's corporate income taxes. She refused to turn the check over to Tsephanyah Hawkins. Tsephanyah Hawkins then terminated Hutchison's services.

40. Shortly after terminating the services of Hutchison, Tsephanyah Hawkins contacted Gardner by telephone and requested that she stop payment on the $7000.00 check and issue a new check and send it to the usual Abilene, Texas post office box to which Gardner had previously sent checks for payments due CDS. Gardner stated that she would do that. Tsephanyah Hawkins informed Gardner that Hutchison was no longer working with CDS. Gardner laughed about that fact and wanted to know why Hutchison was no longer with CDS. She speculated "it was because she diverted the check, wasn't it?" Gardner inquired about a future order similar to the last one. She wanted to know if it was possible to get another twenty Techlennium systems. Tsephanyah Hawkins informed her that he would need further payments on the first order and a written purchase order subject to his approval before making any further shipments to NIRR (of the 20 systems previously shipped, only three had been paid for). She acted friendly and agreeable to that requirement and stated she would send a written purchase order. She reiterated her intent to cancel the $7000.00 check and stated she would reissue that check, and send it to Post Office Box 839, Abilene, Texas. She also promised to send more checks to that same Post Office Box.

41. On information and belief, Gardner did not send a written purchase order, she did not cancel the $7000.00 check, and she did not reissue that check and send it to Post Office Box 839, Abilene, Texas.

### Forced Labor Scheme Hatched

42. Plaintiffs believe and hereby allege that at some point on or about October 7, 2003, shortly before or after that conversation, Gardner and Chistolini, in their capacities as agents of NIRR, contacted Hutchison , they, together with Oster, and with the help of attorney Carter devised and conspired to work a scheme to obtain the additional twenty-plus Techlennium systems for NIRR without paying CDS for them, and without paying CDS for the Techlennium systems previously shipped to NIRR. Each of them agreed to carry out that scheme. That scheme included a plan to cause Tsephanyah Hawkins to believe that if he did not perform the services and labor necessary to provide the Techlennium systems wanted by them, Tsephanyah Hawkins would suffer physical restraint. One means incorporated into the scheme was an abuse or threatened abuse of law or the legal process to obtain labor and services from Tsephanyah Hawkins and Yahchanan Hawkins. That means included a plan to circumvent the due process of justice, and a plan to deprive Tsephanyah Hawkins of many of his constitutional rights, and his equal protection of the laws. Also, as part of the scheme, Tsephanyah Hawkins and CDS were to receive no money from NIRR because without that money, Tsephanyah Hawkins and CDS would not be able to defend themselves adequately in court, and they would not have equal protection of the laws, and/or of equal privileges and/or immunities. In early October of 2003, Gardner, Chistolini, Hutchison, Oster, and Carter corruptly conspired, each in agreement, to obtain or provide labor and services from Tsephanyah Hawkins and Yahchanan Hawkins by means of an illegal ex parte order and an escrow scheme.

Obtaining Ex Parte Order

43. On information and belief, in the days leading up to October 10, 2003, an ex parte order was knowingly and willfully written by Carter, Oster and Hutchison. The order contained clauses calculated to force the labor of Tsephanyah Hawkins and to deprive him of many of his rights

14

including clauses that deprived Tsephanyah Hawkins of many of his property rights. The combination of clauses was engineered to reduce Tsephanyah Hawkins to the status of slave to Hutchison and/or Weeks.

44. On October 10, 2003 at 8:45 a.m., upon the request of Hutchison, Weeks as State of Texas District Court Judge knowingly and willfully and under color of law signed the order labeled "TEMPORARY RESTRAINING ORDER AND ORDER SETTING HEARING". (a copy attached herein and incorporated by reference as Exhibit "B" and hereinafter referred to as "The Order Signed On 10-10-2003"). That fact is plain from the face of The Order Signed On 10-10-2003, where on its last page, above Weeks' signature it states "SIGNED on Oct 10, 2003 at 8:45 A.M." Below Weeks' signature appear the typewritten words "Judge Presiding".

45. The Order Signed on 10-10-2003 is file stamped with a stamp that states "Sharon Owen District Clerk, Callahan County, TX".

46. The Order Signed on 10-10-2003 states, among other things, in its style "IN THE DISTRICT COURT 42ND JUDICIAL DISTRICT CALLAHAN COUNTY TEXAS".

47. By each of their acts described above involving the planning, writing, submitting and signing of The Order Signed on 10-10-2003, Carter, Weeks, Chistolini, Gardner, Oster, NIRR through its representatives Chistolini and Gardner, and Hutchison agreed to carry the plot to enslave Tsephanyah Hawkins by means of abuse or threatened abuse of the law or legal process into effect.

48. It is plain from the face of The Order Signed On 10-10-2003 that Carter submitted the petition requesting The Order Signed On 10-10-2003 to Weeks. Her signature appears on the signature line of the petition affirming the phrase "Respectfully Submitted,"

49. The Order Signed on 10-10-2003 was mislabeled as a Temporary Restraining Order; in actuality, it was a Temporary Injunction, Permanent Injunction, or Final Order.

50. The Order Signed on 10-10-2003 was clearly and plainly not a temporary restraining order. For reasons including but not limited to the following, it was clearly and plainly not issued in accordance with Texas Rules of Civil Procedure regarding the issuance of temporary restraining orders.

    a.  It failed to require a bond.

    b.  It failed to show specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage would result to Hutchison before notice could be served and a hearing held on The Order Signed on 10-10-2003.

    c.  The Order Signed on 10-10-2003 did not define the injury and state why it was irreparable and why the order was granted without notice.

    d.  It did not have an expiration date or time.

    e.  It did not maintain the status quo of the parties.

    f.  It took from Tsephanyah Hawkins and CDS their property, and gave to Hutchison.

    g.  There was no emergency justifying the signing of The Order Signed on 10-10-2003 without a hearing or notice to Tsephanyah Hawkins or CDS. That fact was clear and plain from the pleadings and affidavits of Hutchison.

    h.  There was no probability that immediate and irreparable injury, loss, or damage would result to Hutchison before notice could be served and a hearing

held on The Order Signed on 10-10-2003.   That fact was clear and plain from

the pleadings and affidavits of Hutchison.

51. It is plain from the face of <u>The Order Signed On 10-10-2003</u>, that the style of <u>The Order</u>

<u>Signed On 10-10-2003</u> named the parties as "CLAUDIA HUTCHISON VS. STENOSCRIBE,

INC. AND TSEPHANYAH HAWKINS, INDIVIDUALLY".

52. It is plain from the face of <u>The Order Signed On 10-10-2003</u>, that the application for <u>The</u>

<u>Order Signed On 10-10-2003</u> was presented to Weeks on 10-10-2003: "The application of

Plaintiff for temporary restraining order was presented to the Court today." *The Order Signed On*

*10-10-2003*, Page 1.

53. Hutchison's Original Petition in the State Case (a copy attached herein and incorporated by

reference as Exhibit "A" and hereinafter referred to as "<u>Hutchison's Original State Court</u>

<u>Petition</u>") contained Hutchison's motion for <u>The Order Signed On 10-10-2003</u>, wherein she

request that the Court grant <u>The Order Signed On 10-10-2003</u> without a hearing.  "Claudia

Hutchison prays that the Court grant the Motion for Temporary Orders without hearing".

54. <u>Hutchison's Original State Court Petition</u> , and its attached affidavits, and <u>The Order Signed</u>

<u>on 10-10-2003</u>  contained no prima facie evidence that Hutchison held a lien, or title, or

liquidated claim against the subject matter of <u>The Order Signed on 10-10-2003</u> including, but not

limited to CDS, the property located at 3350 Private Road 2559, Clyde, Texas.  <u>Hutchison's</u>

<u>Original State Court Petition,</u> and its attached affidavits, and <u>The Order Signed on 10-10-2003</u>

contained no prima facie evidence that Hutchison was an officer, shareholder, or director of

CDS.  <u>Hutchison's Original State Court Petition,</u> and its attached affidavits, and <u>The Order</u>

<u>Signed on 10-10-2003</u>   contained no prima facie evidence that CDS was a partnership.

55. Hutchison's Original State Court Petition , and its attached affidavits, and The Order Signed on 10-10-2003 contained prima facie evidence that Tsephanyah Hawkins owned the subject matter of The Order Signed on 10-10-2003 including, but not limited to CDS, the property located at 3350 Private Road 2559, Clyde, Texas. Hutchison's Original State Court Petition, and its attached affidavits, and The Order Signed on 10-10-2003 contained prima facie evidence or strong evidence that Tsephanyah Hawkins was an officer, shareholder, and director of CDS. Hutchison's Original State Court Petition, and its attached affidavits, and The Order Signed on 10-10-2003  contained prima facie or strong evidence that CDS was a corporation.

56. Carter, Hutchison, and Weeks knew or should have known that Hutchison was not an officer of CDS and Tsephanyah Hawkins was.  On October 2, 2003, about a week before submitting The Order Signed on 10-10-2003, Carter obtained the most recent disclosures from the Secretary of State of Texas.  Those reports plainly demonstrated that Tsephanyah Hawkins was the sole officer of CDS.  Hutchison's name appeared nowhere on those reports.

57. In the weeks leading up to Weeks' signing of The Order Signed on 10-10-2003, Tsephanyah Hawkins was readily available for service.  He was in Callahan county at the time and was at his residence each and every evening and most days including but not limited to each and every day of the month of October of 2003 leading up to the signing of The Order Signed on 10-10-2003.

58. Hutchison knew Tsephanyah Hawkins was available to be served.

59. The Order Signed on 10-10-2003 was served within hours of being filed.

60. Prior to the signing of The Order Signed on 10-10-2003, there was no showing that it was impossible or even difficult to serve Tsephanyah Hawkins with notice for a hearing.

61. The Order Signed on 10-10-2003 was obtained without any effort, however informal, to invite or permit Tsephanyah Hawkins' or CDS's participation in the proceedings.

18

62. Weeks, Hutchison and Carter deliberately failed to give notice to Tsephanyah Hawkins in order to circumvent due process and to deny Tsephanyah Hawkins of equal protection.

63. It is plain from the fact of <u>The Order Signed on 10-10-2003</u>, that Weeks examined the pleading. It is also plain from the face of <u>The Order Signed On 10-10-2003</u>, that Weeks signed <u>The Order Signed on 10-10-2003</u> based upon his examination of the pleading of only one party, Hutchison, and her pleading's attached affidavits:

> "The Court examined the pleading of Plaintiff and finds that [Hutchison] is entitled to a temporary restraining order."
>
> *The Order Signed On 10-10-2003*, Page 1.

> "Based upon the attached affidavits incorporated herein for all purposes, [Hutchison] requests an immediate temporary restraining order against Tsephanyah Hawkins a/k/a Russell Owen, Jr. (HAWKINS), his agents of [sic] assigns from committing the following acts:"
>
> *The Order Signed On 10-10-2003*, Page 1.

64. Hutchison requested that <u>The Order Signed On 10-10-2003</u> be granted without a hearing:

> "Claudia Hutchison prays that the Court grant this Motion for Temporary Orders without hearing".
>
> *Plaintiff's Original State Court Petition.*

65. It is plain from the face of <u>The Order Signed On 10-10-2003</u>, that Weeks ordered the clerk of the 42nd Judicial District Callahan County Court to issue <u>The Order Signed On 10-10-2003</u>:

> "IT IS THEREFORE ORDERED that the clerk of this Court issue a restraining order restraining [Tsephanyah Hawkins]"
>
> *The Order Signed On 10-10-2003*, Page 1.

66. District Clerk of the 42nd Judicial District of Callahan County, Texas, Sharon Owens, issued <u>The Order Signed On 10-10-2003</u> on October 10, 2003. Above the signature of Sharon Owens on The Citation of Personal Service of The Order Signed On 10-10-2003 appears the following typewritten statement:

"Issued and given under my hand and the seal of said Court at Baird, Texas, this day of OCTOBER 10, 2003".

67. On 10-10-2003, at 1:40 pm, Hutchison filed <u>The Order Signed On 10-10-2003</u> together with a document entitled Plaintiff's Original Petition with the Callahan County 42nd Judicial District Court Clerk. It received the cause number 18,093. That case is hereinafter referred to as the "State Case".

68. Those were the first filings in the State Case. Thus Weeks signed <u>The Order Signed On 10-10-2003</u> almost five hours before there was any paper filed in the State Case – before there was the State Case, before there was any case involving CDS and/or Tsephanyah Hawkins.

69. At that same time he signed <u>The Order Signed on 10-10-2003</u>, Weeks approved a bond made payable "unto the District Judge of Callahan County, Texas" who was and is Weeks. Hutchison was principal on the bond. Oster and Beverly Garvey are the sureties. Garvey's signature on the bond is forged by Hutchison. The bond is for $2000.00. <u>The Order Signed on 10-10-2003</u> states "The requirement of a bond is waived." Texas Rules of Civil Procedure require that the bond be made payable to the adverse party.

*Forced Labor Clauses*

70. <u>The Order Signed on 10-10-2003</u> was plainly not a temporary restraining order. That fact was plain to Weeks or should have been plain to Weeks before he signed it. It contained the following clauses that were calculated to coerce Tsephanyah Hawkins to perform labor and services for Claudia Hutchison and The New England School of Court Reporting and others. They are hereinafter referred to as "<u>The Clauses That Forced the Labor or Services of Tsephanyah Hawkins Contained in the 10-10-2003 Order</u>". Tsephanyah Hawkins individually, and therefore all officers, shareholders, and directors of CDS was enjoined from:

20

1. "Not fulfilling current obligations or commitments to customers, specifically, but not limited to the New England School of Court Reporting"

2. "Not providing software upon request by Plaintiff or in conjunction with any current orders"

### *Deprivation of Property Without Due Process*

71. The Order Signed on 10-10-2003 contained the following clauses that are hereinafter referred to as "Clauses Contained in the 10-10-2003 Order That Deprived Tsephanyah Hawkins of His Property Without Due Process". Tsephanyah Hawkins, therefore all shareholders, officers, and directors of CDS was enjoined from:

1) "Selling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of either party, whether personalty or realty, except as specifically authorized by order of this Court"

2) "Making withdrawals from any checking or savings account in any financial institution for any purpose, until a hearing on the restraining order, unless necessary for utilities or taxes"

3) "Tampering with the tangible property of one or both of the parties, including any document that represents or embodies anything of value, and causing pecuniary loss to the other party"

4) "Damaging or destroying the tangible property of one or both of the parties, including any document that represents or embodies anything of value"

5) "Destroying, removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both of the parties"

21

6) "Hiding or secreting property from the Plaintiff"

7) "Not providing software upon request by Plaintiff or in conjunction with any

current orders"

8) "Destroying or changing ownership of computer files, records, any corporation

property, Hawkins personal property, Plaintiff's personal property"

9) "Restricting Plaintiff from access to the building where she has been operating the

business entity or any necessary personnel"

10) "Altering or effecting any utilities of the commercial building or the Plaintiff's

residence, including changing any phone numbers or routing of phone numbers,

and/or in the event that Hawkins has already rerouted the phone numbers,

changed the phone numbers, or disrupted the status quo of the phone service, to

reinstate that phone service"

11) "Misrepresenting or refusing to disclose to the other party or to the Court, on

proper request, the existence, amount, or location of any property of one or both

of the parties."

### ***Deprivation of Freedom of Expression***

72. The Order Signed On 10-10-2003 includes the following clauses which will hereinafter be

referred to as "Clauses Contained in the Order Signed On 10-10-2003 that Violate Tsephanyah

Hawkins' Right to Freedom of Expression".  Tsephanyah Hawkins, therefore all officers,

shareholders, and directors of CDS was restrained from:

1) "Slandering or libeling the Plaintiff in any manner;"

2) "Interfering with ongoing customer relations between the customers and

Plaintiff;"

22

*Tsephanyah Hawkins Served with the Order Signed on 10-10-2003*

73. On October 10, 2003 at or around 6:00 pm on a Friday evening, Tsephanyah Hawkins was served at his home with The Order Signed On 10-10-2003.  Prior to that time, Tsephanyah Hawkins had received no notice of the original petition or The Order Signed on 10-10-2003.

74. Among other things, The Order Signed on 10-10-2003 essentially fired and/or suspended Tsephanyah Hawkins from his positions with CDS without due process.

### *Tsephanyah Hawkins and Yahchanan Hawkins Perform Labor and Services Because of Abuse or Threatened Abuse of the Legal Process*

75. Because of the threat of the loss of his liberty posed by The Order Signed On 10-10-2003, Tsephanyah Hawkins began to fulfill the broad requirements of The Order Signed On 10-10-2003.  He ceased using all bank accounts, and began the process of fulfilling the obligations or potential obligations to customers.

76. Despite the fact that Tsephanyah Hawkins was served after 6 pm on a Friday evening with The Order Signed 10-10-2003, and the following Monday was a bank holiday (Columbus Day), on October 13, 2003 (Columbus Day), Tsephanyah Hawkins received a letter from Carter hereinafter referred to as "Carter's October 13, 2003 Letter to Tsephanyah Hawkins" threatening him with "further action for contempt" if he did not fulfill the requirements of The Order Signed 10-10-2003 including requirements of the personal services of Tsephanyah Hawkins:

> "To prevent further action for contempt and to amicably resolve the issues, I request, on my client's behalf, that by Tuesday morning, you hand deliver the credit card machine to the business building, that you provide 22 keys to the software to complete the approved New England School of Court Reporting contract (StenoScribe, Inc. owes 2 keys for the last order), and produce 21 Sound enhancers for the approved New England School of Court Reporting contract."

77. On or about November 1, 2003, Anderson entered into an attorney client relationship with CDS and Tsephanyah Hawkins. He acted as co counsel with Self in representing CDS and Tsephanyah Hawkins in the State Case.

78. On or about October 17, 2003, Tsephanyah Hawkins hired Self to represent him and CDS in this case. Self negligently failed to suggest the use of a petition for writ of mandamus, or an emergency stay, or a federal injunction against Weeks and his co-conspirators at any time during his representation of CDS and Tsephanyah Hawkins. Self and Anderson negligently failed to file a petition for writ of mandamus, and/or emergency stay, and/or a federal injunction to stop the rights violations and other violations against Plaintiffs. Self and Anderson negligently failed to take the proper actions to defendant CDS and Tsephanyah Hawkins against Weeks and the Plaintiff in the State Case.

79. As part of the conspiracy to obtain labor or services by means of an abuse or threatened abuse of the law or legal process, on or about October 17, 2003, Chistolini faxed a letter with the letterhead "Chistolini & DeSimone ATTORNEYS AT LAW" with an attached "VERIFIED COMPLAINT" to Charles C Self, III, attorney for CDS and Tsephanyah Hawkins at that time. That letter was calculated by Gardner in her capacity with NIRR and Chistolini in his capacities with NIRR and C&S to simulate legal process and to intensify the threat presented by The Order Signed on 10-10-2003, in particular, the threat embodied by the clause wherein Tsephanyah Hawkins was restrained individually from "[n]ot fulfilling current obligations or commitments to customers, specifically, but not limited to the New England School of Court Reporting". The letter faxed by Chistolini effectively threatened that Marilyn Gardner would swear under oath that CDS, Tsephanyah Hawkins, and Yahchanan Hawkins owes an obligation to NIRR. Marilyn Gardner and Chistolini knew there was no such obligation. That threat was knowingly made for

24

the purpose of making Tsephanyah Hawkins believe that if he did not perform the services necessary to provide the court reporting systems NIRR wanted, he would go to jail because he would be in contempt of "[n]ot fulfilling current obligations or commitments to customers, specifically, but not limited to the New England School of Court Reporting" (emphasis added).

80. Because of the threats to his liberty imposed by The Order Signed On 10-10-2003, and threats of contempt by Carter, Chistolini, NIRR, and Gardner, Tsephanyah Hawkins redirected CDS's mail to a mailbox to which Claudia Hutchison had access. He moved computers to his building located at 3350 Private Road 2559, Clyde, Texas. He made Claudia Hutchison a signer on CDS's bank account. He moved a credit card machine to his building located at 3350 Private Road 2559, Clyde Texas. He has not seen the credit card machine since. He gave Claudia Hutchison keys to the building located at 3350 Private Road 2559, Clyde, Texas. Tsephanyah Hawkins labored to provide and by that labor did provide the product necessary to fulfill a fabricated obligation to NIRR so he would not go to jail. His labor included but was not limited to programming keys and assembling the circuit boards for Sound Enhancers, producing labels and applying them.

81. Because of the threats to his liberty imposed by The Order Signed On 10-10-2003, and threats of contempt by Carter, Tsephanyah Hawkins also performed the personal services including but not limited to moving the credit card machine to the building located at 3350 Private Road 2559, Clyde Texas, moving a computer to the building located at 3350 Private Road 2559, redirecting CDS's mail to a mailbox to which Claudia Hutchison had access, filling out the paperwork necessary to make Claudia Hutchison a signer on CDS's bank accounts.

82. Because of the threats to Tsephanyah Hawkins' liberty posed by The Order Signed On 10-10-2003, Yahchanan Hawkins also labored to provide and by that labor did provide the product

necessary to fulfill the obligation that was fabricated by Gardner, Chistolini, Hutchison, and Carter, to NIRR so Tsephanyah Hawkins would not go to jail. His labor included but was not limited to assembling the circuit boards for Sound Enhancers, machining the cases, performing engineering work necessary to complete the Sound Enhancers, trouble shooting and repairing problem Sound Enhancers, and performing quality and functional tests on the completed Sound Enhancers.

83. The fruits of the labor of Tsephanyah Hawkins and Yahchanan Hawkins, software protection keys and Sound Enhancers made from components belonging to CDS, Tsephanyah Hawkins, and Yahchanan Hawkins were delivered to Hutchison and she shipped most of them to NIRR. Neither Hutchison nor NIRR has yet paid CDS, Tsephanyah Hawkins, or Yahchanan Hawkins for the product so delivered to NIRR despite many demands by CDS for payment.

### *The Order Signed On 10-23-2003*

84. From on or about October 10, 2003 to the days leading up to October 23, 2003, another order was knowingly and willfully written and prepared by Carter and Hutchison. The order contained clauses calculated to force the labor of Tsephanyah Hawkins and to deprive him of many his rights including clauses that deprived Tsephanyah Hawkins of virtually all of his property rights. The combination of clauses was calculated to reduce Tsephanyah Hawkins to the status of slave. On October 23, 2003 at 10:00 a.m., Hutchison, through her attorney of record Carter submitted that order with "PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION" hereinafter referred to as "Hutchison's First Amended Original Petition Filed in the State Case" wherein she requested Weeks sign an "ORDER TO CONTINUE TEMPORARY RESTRAINING ORDER AND ORDER SETTING HEARING" hereinafter referred to as "The Order Signed On 10-23-2003". Weeks signed The Order Signed on 10-23-2003 on October 23, 2003.

26

85. The Order Signed on 10-23-2003 was clearly mislabeled as a Temporary Restraining Order; in actuality, it was clearly not a Temporary Restraining Order.

86. That order was signed on October 23, 2003 at 10:00 a.m. by Weeks without a hearing and without adequate notice to Tsephanyah Hawkins, CDS, or their attorney of record at the time, Self. That fact is plainly demonstrated on page thirteen of Hutchison's First Amended Original Petition Filed in the State Case. Therein, under the heading "CERTIFICATE OF SERVICE", Carter signs "I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on October 23, 2003." It is therefore plain that The Order Signed on 10-23-2003 was signed by Weeks on the same day the order was served on the parties.

87. On October 23, 2003 at 10:40 a.m., forty minutes after it was signed, Hutchison filed with the 42nd Judicial District Court Clerk, Callahan County, Texas The Order Signed on 10-23-2003, and Hutchison's First Amended Original Petition Filed in the State Case containing the motion for The Order Signed on 10-23-2003.

88. The Order Signed on 10-23-2003 was signed based upon Weeks' consideration of only Hutchison's pleadings:

> "The Court examined the pleadings of [Hutchison] and finds that [Hutchison] is entitled to continue the temporary restraining order under the terms plead for and to re-set the hearing." *The Order Signed on 10-23-2003.*

89. Hutchison requested that the The Order Signed on 10-23-2003 be signed without a hearing:

> "Claudia Hutchison prays that the Court grant this Continued Order for Temporary Orders without hearing, and that the Motion for Appointment of Receiver and Permanent Injunction be heard, with any other relief that the Court may determine is fair and equitable."

> *Plaintiff's First Amended Original Petition* page 13.

90. The Order Signed on 10-23-2003 states:

"The requirement of a bond is waived."

*The Order Signed on 10-23-2003*, page 5.

91. It is plain from the language of The Order Signed on 10-23-2003 that it is not the same as The Order Signed on 10-10-2003. Moreover, the order itself states that it is "reformed". The Order Signed on 10-23-2003 states:

"IT IS THEREFORE ORDERED that the original temporary restraining order is reformed and continued as set out herein, restraining [Tsephanyah Hawkins and CDS], and [Tsephanyah Hawkins and CDS] are immediately restrained from:"

92. Hutchison's First Amended Original Petition Filed in the State Case:

"Only upon threat of lawsuit and after hiring counsel, did [Tsephanyah Hawkins] agree to complete the contract with the New England School of Court Reporting."

93. In Hutchison's First Amended Original Petition Filed in the State Case, Hutchison states:

"[a]dditionally, [Hutchison] has found bugging devices in the building when [Tsephanyah Hawkins] told her that the building 'had ears' and subsequently has located a device planted in the building to monitor her computer usage from a remote location and positive indication for continued bugging, in violation of federal laws. In a further act of contempt for the Court, the [Tsephanyah Hawkins] hid a computer in a locked closet that was supposed to be sent out to the Navy over a week ago, in defiance of the Court orders (not to conceal property, not to interfere with contracts. or to perform any at which has a negative impact on the corporation.)"

94. The Order Signed on 10-23-2003 contained the following clauses which are hereinafter referred to as "The Clauses That Forced the Labor or Services of Tsephanyah Hawkins Contained in the 10-23-2003 Order". Tsephanyah Hawkins was restrained from:

1) "Not fulfilling obligations or commitments to customers, specifically. but not limited to the New England School of Court Reporting"

2) "Not providing software upon request by [Hutchison] or in conjunction with any orders"

95. <u>The Order Signed on 10-23-2003</u> contained the following clauses which are hereinafter referred to as "<u>The Clauses That Deprived Tsephanyah Hawkins of His Property Without Due Process Contained in the 10-23-203 Order</u>" Tsephanyah Hawkins was enjoined from:

1) "Selling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of either party, whether personalty or realty, except as specifically authorized by order of this Court;"

2) "Making withdrawals of any type from any checking or savings account containing corporation funds in any financial institution for any purpose, and if [Tsephanyah Hawkins and CDS] has removed or transferred any funds on or since the date of filing, to immediately return said funds to the account from which it was removed or transferred."

3) "Tampering with the tangible property of one or both of the parties, including any document that represents or embodies anything of value"

4) "Damaging or destroying the tangible property of one or both of the parties, including any document that represents or embodies anything of value"

5) "Misrepresenting or refusing to disclose to the other party or to the Court, on proper request, the existence, amount, or location of any property of one or both of the parties"

6) "Destroying, removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both of the parties;"

7) "Hiding or secreting property from [Hutchison]"

      8)  "Destroying, removing, or changing computer files, records, any corporation

          property, Hawkins personal property, [Hutchison's] personal property"

96. The Order Signed On 10-23-2003 includes the following clauses which, for brevity sake, will

hereinafter be referred to as "The Clauses that Violate Tsephanyah Hawkins' Right to Freedom

Of Expression Contained in the Order Signed On 10-23-2003". Tsephanyah Hawkins was

restrained from:

      1)  "Slandering or libeling the [Hutchison] in any manner;"

      2)  "Interfering with ongoing customer relations between the existing customer and

          [Hutchison] and between future customers and [Hutchison];"

### *The Order Signed On 11-6-2003*

97. From on or about October 23, 2003 to the days leading up to November 6, 2003, another

order was knowingly and willfully written and prepared by Carter and Hutchison. The order

contained clauses calculated to force the labor of Tsephanyah Hawkins and to deprive him of

many his rights including clauses that deprived Tsephanyah Hawkins of virtually all of his

property rights. The combination of clauses was calculated by Carter and Hutchison to reduce

Tsephanyah Hawkins to the status of slave. That order hereinafter referred to as "The Order

Signed on 11-6-2003" was signed by Weeks over objections of Tsephanyah Hawkins' and

CDS's counsel of record at that time, Self, on November 6, 2003.

98. The Order Signed on 11-6-2003 was mislabeled as a Temporary Restraining Order; in

actuality, it was a Temporary Injunction, Permanent Injunction, or Final Order.

99. The Order Signed 11-6-2003 contained the following clauses which are hereinafter referred

to as "The Clauses That Forced the Labor or Services of Tsephanyah Hawkins Contained in the

11-6-2003 Order". Tsephanyah Hawkins was enjoined from:

1) "Not fulfilling obligations or commitments to customers, specifically, but not limited to the New England School of Court Reporting"

2) "Not providing software upon request by [Hutchison] or in conjunction with any orders"

100.   The Order Signed 11-6-2003 contained the following clauses which are hereinafter referred to as "The Clauses That Deprived Tsephanyah Hawkins of His Property Without Due Process Contained in the 11-6-2003 Order".  Tsephanyah Hawkins was enjoined from:

1) "Selling, transferring, assigning, mortgaging, encumbering or in any other manner alienating any of the property of either party, whether personalty or realty, except as specifically authorized by order of this Court"

2) "Making withdrawals of any type from any checking or savings account containing corporation funds in any financial institution for any purpose, and if [Tsephanyah Hawkins and CDS] has removed or transferred any funds on or since the date of filing, to immediately return said funds to the account from which it was removed or transferred"

3) "Destroying, removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both of the parties"

4) "Tampering with the tangible property of one or both of the parties, including any document that represents or embodies anything of value, and causing pecuniary loss to the other party"

5) "Misrepresenting or refusing to disclose to the other party or to the Court, on proper request, the existence, amount, or location of any property of one or both of the parties;"

6) "Damaging or destroying the tangible property of one or both of the parties, including any document that represents or embodies anything of value"

7) "Hiding or secreting property from [Hutchison]"

101.    The Order Signed On 11-6-2003 includes the following clause which, for brevity sake, will hereinafter be referred to as "The Clause that Violate Tsephanyah Hawkins' Freedom of Expression Contained in the Order Signed On 11-6-2003". Tsephanyah Hawkins was restrained from:

1) "Slandering or libeling [Hutchison] in any manner;"

2) "Interfering with ongoing customer relations between the existing customer and [Hutchison] and between future customers and [Hutchison];"

102.    After a 11-13-2003 hearing to try to hold Tsephanyah Hawkins in contempt, Self, Anderson, Weeks, and Carter held an off the record meeting where they made some sort of off-the-record agreement despite Tsephanyah Hawkins' direct and lawful instructions to Self and Anderson that there was to be no such agreements. As a result, Tsephanyah Hawkins was instructed by Self to allow Hutchison access to the building located at 3350 Private Road 2559, Clyde, Texas, email accounts, mail, and other items. Self intentionally mislead Tsephanyah Hawkins into believing that it was the order of the Court pending an agreement to be worked out between Tsephanyah Hawkins and Hutchison. As a result of that negligent disobedience of direct instructions of Tsephanyah Hawkins, CDS and Tsephanyah Hawkins suffered damages.

103.    In the days and weeks following and preceding, property including but not limited to thousands of dollars of construction tools and equipment, a printer, copier, LCD projector, cash, multi-track sound card, and server computer, was stolen from the building located at 3350 Private Road 2559. And CDS was destroyed.

32

104.    In the weeks following, Hutchison, and Oster occupied the building located at 3350
Private Road 2559, Clyde, Texas.  And on or about November 20, 2003, Tsephanyah Hawkins
found a stack of anti-House of Yahweh literature in one of the rooms of the building located at
3350 Private Road 2559, Clyde, Texas, that had been downloaded from the internet and printed
out on CDS's printer.


***Hutchison Establishes Bank Account as Artifice in Scheme to Obtain Funds Under Control of***
***Financial Institutions by Means of Fraud or Deception***

105.    At some point around the time of the obtaining of The Order Signed on 10-10-2003,
Hutchison established a bank account with The Peoples State Bank in Clyde, Texas.  She
willfully and knowingly caused the name on that account to read "Claudia Hutchison DBA
StenoScribe" with the intention of deceiving financial institutions into the belief that she was
authorized to obtain funds under their control due CDS (formerly 'StenoScribe, Inc.').

***Diversion of Mail and Accounts Receivables Scheme***

*106.*    At the time of the filing of the state lawsuit, CDS was operating from a new building
located next to a mobile home where Hutchison resided.  The building and Hutchison's mobile
were on two separate lots that had previously been portions of one lot.  A mailbox for the
original lot was shared by Hutchison and CDS until a new mailbox could be installed and the
address changes could be implemented.  The common address was 3282 Private Road 2547,
Clyde, Texas.  Once the original lot was subdivided by the previous owner into three parcels, the
previous driveway became a private road and new addresses were created.  The address for the
building that was used by CDS is 3350 Private Road 2559, Clyde, Texas and Hutchison's mobile
home became 3372 Private Road 2559.  Months prior to the lawsuit, some of CDS's mail began

to be received at that common mailbox with the address 3282 Private Road 2547, Clyde, Texas. Around the time of the filing of the State Case, Tsephanyah Hawkins had all CDS'd mail going to that address forwarded to 3706 Private Road 2547 or 3471 Private Road 2547. But because of the threat imposed by The Order Signed On 10-10-2003, Tsephanyah Hawkins forwarded CDS's mail back to 3282 Private Road 2547. After a period of days, Tsephanyah Hawkins attempted to redirect CDS's mail away from 3282 Private Road 2547. Hutchison, using The Order Signed On 10-23-2003, and/or The Order Signed On 11-6-2003 overrode Tsephanyah Hawkins' attempts to forward CDS's mail going to 3282 Private Road 2547. Hutchison accomplished this by presenting those court orders to the Postmaster and demanding that CDS's mail not be forwarded away from the mailbox located at 3282 Private Road 2547, Clyde, Texas. The Postmaster of 79510, Keith Jackson, complied with her demands and denied Tsephanyah Hawkins' requests, and so willfully and knowingly Hutchison obtained CDS's mail for months and stole checks thereby received and kept CDS's mail, and used some of that mail in furtherance of the schemes described in this complaint. Hutchison is still in possession of that mail, and/or she has destroyed it.

### *The Escrow Scheme*

107.   In an October 13, 2003 correspondence from Carter to Tsephanyah Hawkins, hereinafter and referred to in this complaint as "Carter's October 13, 2003 letter to CDS and Tsephanyah Hawkins", Carter represented that she came to possess a check for $7000.00 due to CDS from NIRR. On information and belief, that check was the same $7000.00 check intercepted and stolen from CDS by Hutchison on or about October 7, 2003.

108.   In Carter's October 13, 2003 letter to CDS and Tsephanyah Hawkins, regarding the $7000.00 check, Carter wrote:

34

> "There is a check in the amount of $7000 which their attorney asked me to hold until the issues between the two of you are settled, or until further notice from their attorney."

109.    An October 15, 2003 correspondence from Chistolini to Tsephanyah Hawkins hereinafter referred to as the "October 15, 2003 correspondence from Chistolini", demonstrated that Carter came to possess and hold in "Escrow" an additional $14,000.00 in checks belonging to CDS:

> "As you are aware, Attorney Victoria Carter's office is holding funds in Escrow pending a resolution to the litigation. In addition to the funds that Attorney Carter is holding, we forwarded to Attorney Carter on October 14, 2003, an additional draft in the amount of Fourteen Thousand ($14,000.00) Dollars, which also will be held in Escrow."

110.    Chistolini wrote that letter in the ordinary course of his employ and in the ordinary course of the business of C&D. The letterhead on the letter states "Chistolini & Simone ATTORNEYS AT LAW".

111.    Prior to Carter's possession of the funds she was holding in "Escrow", neither CDS nor Tsephanyah Hawkins authorized Carter to hold, spend, or disperse any checks, funds, or property belonging in part or in full to CDS.   Neither CDS nor Tsephanyah authorized Chistolini to send any funds to Carter.

112.    Despite a request for a full accounting, neither CDS nor Tsephanyah Hawkins have received an accounting of the substantial funds Carter held in escrow.

113.    Carter knew or should have known that her client Hutchison had no authority with CDS to grant permission for Carter to hold and/or disburse funds belonging in part or in full to CDS. Chistolini knew or should have known Carter's unsuitability as an "Escrow" agent for those funds.

114.   Without permission, Carter intentionally, knowingly, or recklessly transferred control of the checks she "held in Escrow" to her client Hutchison. Carter knew that the transfer involved substantial risk to CDS. She did not inform CDS or Tsephanyah Hawkins of the transfer.

115.   In the alternative, Carter never had possession of the checks. Instead, she lied about holding the checks as part of a conspiracy with Hutchison to conceal the whereabouts of funds obtained from financial institutions by means of fraud or deception, and Chistolini never sent the checks to Carter, but instead sent them to Hutchison. Discovery should reveal the facts in this matter.

116.   At some point on or about October 15 of 2003, Hutchison deposited the checks into her Peoples State Bank account established with the name Claudia Hutchison DBA StenoScribe, and by that act intentionally deceived the bank into believing that she was authorized to obtain the funds represented by those checks.

117.   Plaintiffs believe and hereby allege that the first checks diverted and fraudulently deposited into Hutchison's Peoples State Bank account were the following:

> a.  Check 1061, dated 9/30/03 from New England School of Court Reporting Inc., (NIRR) for $7000.00;

> b.  Check 1086 for $14,000.00 dated 10/14/03 from New England School of Court Reporting Inc., (NIRR);

118.   Plaintiffs believe and hereby allege that the funds so obtained exceeded $24,000.00 by October 29, 2003. As time went on, that amount increased. Plaintiffs' belief is a result of their analysis of the Peoples State Bank statement of the Claudia Hutchison DBA StenoScribe account that was provided in the discovery process of the State Case.

119.    Sometime after depositing the checks, the funds were depleted by Hutchison, and the Peoples State Bank account was closed.

120.    From October of 2003 to February, 2004 and beyond, Hutchison diverted CDS's mail to her home address and kept it.  She intentionally deposited checks received in the mail belonging to CDS into her own Peoples State Bank Account or into other bank accounts to be determined by discovery, and thus obtained funds under the control of a financial institution by means of fraud or deception.

121.    On information and belief, from the examination of documents provided in the discovery phase of the State Case, the amount of those funds exceeded $45,000.00.  That amount does not include an electronic funds transfer of $9998.00 or the $24,000.00 deposited from the "Escrow" held by Carter.

### *Software Protection Circumvention Scheme*

122.    On or about December 4, 2003, Hutchison and Oster conspired to circumvent the hardware protection device utilized by CDS to limit access to its court reporting software's functionality.  They hired a person or persons to modify the executable file of the software so the hardware protection device would not longer be required.  That modification allowed Hutchison and Oster to copy and sell pirated versions of CDS's computerized court reporting software.

123.    From on or about December 4, 2003 on, Hutchison and Oster engaged in the marketing and sales of pirated versions of CDS's computerized court reporting software in interstate commerce through a series of business entities established and/or operated by Hutchison and Oster for that purpose including but not limited to SAW, and SCSCR, and Vocedit.  Those businesses were operated and/or established by income derived directly or indirectly from the

37

various schemes described within this complaint. Oster and Hutchison marketed computerized court reporting systems nationwide.

### *Bank Fraud Scheme*

### *Diversion of Electronic Funds Transfer*

124.   CDS's clientele include the United States Department of Defense. As a vendor to the Department of Defense, CDS has a record in the Department of Defense's Central Contractor Registration database. The Central Contractor Registration database is designed to be the single repository for vendor data of vendors who do business with the Department of Defense. The data in that database is used to facilitate payments to vendors by mail or by electronic funds transfer.

125.   On or about December 1, 2003, at some point after establishing the Claudia Hutchison DBA StenoScribe bank account at the Peoples State Bank in Clyde, Texas, Hutchison, her representatives or agents gained unauthorized access to the Central Contractor Registration database data for CDS and without authorization from CDS, willfully and knowingly modified that data so electronic funds transfers would be deposited into her Claudia Hutchison DBA People's State Bank account instead of CDS's bank account.

126.   As an intentional result of her intentional modification to the data contained in the Central Contractor Registration database, a payment of $9998.00 due to CDS was electronically transferred into her Peoples State Bank account in Clyde, Texas on or about January 2, 2004. That payment was for product delivered under contract number #N002403P4015. After those funds were transferred into her account, Hutchison depleted the funds, and the account was closed. By that act, she deceived the Peoples State Bank and The United States Department of

Defense into believing that she was authorized to deposit those funds and spend or otherwise deplete them.

## *Intimidation, Threats of Violence, Attempted Murder Scheme*

### *Phone Calls*

127.   Around the time of the electronic funds transfer of January 2, 2004, Tsephanyah Hawkins' and Yahchanan Hawkins' recently widowed mother began receiving hang-up phone calls. One of those calls, received around 4:00 am, stated that if she didn't call her two boys off, the caller was going to cut off her head and spit down her neck. Tsephanyah Hawkins has often heard Hutchison paraphrase that statement after the termination of a call with a customer.

### *Vehicular Threats*

128.   From the time of the filing of the state lawsuit, on or around October 10, 2003, whenever Oster would pass Tsephanyah Hawkins or Yahchanan Hawkins in his vehicle, he would intentionally swerve as if he were going to crash head on into them as a means of threatening and intimidating Tsephanyah Hawkins and Yahchanan Hawkins. This was done in part so that Tsephanyah Hawkins and Yahchanan Hawkins would perform labor and services against their will.

### *The Shooting*

129.   Approximately two days after the electronic funds transfer of $9998.00, Tsephanyah Hawkins entered the building at 3350 Private Road 2559, Clyde, Texas.

130.   It was approaching dusk. There were no lights on in Hutchison's next-door mobile home. The usual barking dog, Milo, was silenced or elsewhere to make the mobile home appear vacant. There were no external indications that anyone was in the mobile home.

131.    Upon opening the north facing second story door of the building located at 3350 Private Road 2559, Clyde, Texas, from the inside, Tsephanyah Hawkins spotted a semi-automatic firearm in the hand of Oster.  It was plain from his stance that Oster was lying in wait for Tsephanyah Hawkins.  Unprovoked, Oster pointed the firearm at Tsephanyah Hawkins and discharged it twice.  He fired the weapon from Hutchison's porch.

132.    Plaintiffs believe and hereby allege that Hutchison and Oster were lying in wait in conspiracy to murder and/or threaten Tsephanyah Hawkins with violence because Tsephanyah Hawkins and his testimony at a hearing or potential hearing was perceived by them as the only thing between them and the riches they could gain by their scheme to take over and/or destroy CDS.

133.    On information and belief derived from documents provided in the discovery phase of the State Case, in the weeks surrounding the shooting Oster received over $10,000.00 of the funds that were diverted by means of deception and/or fraud into Hutchison's Peoples State Bank account.  Oster received those funds knowing the same to have been stolen, unlawfully converted, or taken from CDS and/or Tsephanyah Hawkins.

### *Interstate Travel Scheme*

### *Concealment of Stolen Property and Monies*

134.    On or about February 16, 2004, NIRR, through its representatives Chistolini and Gardner, acted under the false pretence that they were returning excess software and hardware to Hutchison because they thought she was CDS and therefore entitled to the returned hardware and software.  Under those false pretenses, Gardner and/or Chistolini, knowing the hardware and software was stolen, knowing Hutchison was not entitled to the software and hardware, transferred some of the hardware and software to Hutchison.  The hardware and software given

40

by NIRR to Hutchison was never returned to CDS and, thus, NIRR still owes CDS for it. In the alternative, NIRR never had the hardware and software that they allegedly returned to Hutchison. Rather, that hardware and software was kept back by Hutchison, sold to others, and NIRR fraudulently stated that they had returned that hardware and software to Hutchison in order to conceal the exact nature of their conspiracy.

135.    Hutchison, knowing the hardware and software was stolen, unlawfully converted, or unlawfully taken, traveled across state lines to Massachusetts to receive the hardware and software. After receiving it, she traveled across state lines to Pennsylvania with the hardware and software so she could market and sell it to obtain funds to further her criminal activities and the criminal activities of others. Ultimately, the hardware and software given to Hutchison by NIRR or it agents was marketed and sold in interstate commerce by Oster and Hutchison to customers in various states. This was accomplished through a complex and intentionally deceptive network of business entities, fictitious names, and bank accounts established by Oster and Hutchison for the purpose of concealing, marketing, selling, and laundering the funds obtained from the sales and marketing of the property that was stolen, unlawfully converted, or taken from CDS, Tsephanyah Hawkins, and Yahchanan Hawkins. At the time of these activities, Gardner, Chistolini, Oster, and Hutchison knew the hardware and software was stolen, unlawfully converted, or taken.

### *Chistolini's Escrow and the Entity Scheme*

136.    In late 2003, CDS had forfeited its charter. Prior to that time, it was known as "StenoScribe, Inc." When Tsephanyah Hawkins attempted to regain CDS's charter with the name "StenoScribe, Inc." he was informed by the state of Texas that the name "StenoScribe" was taken by StenoScribe Reporting Inc.. Despite the fact that CDS had used the name

"StenoScribe, Inc." since 1997, and the StenoScribe Reporting Inc. had used its name since 1994, the State of Texas informed CDS that it could not use that name again without StenoScribe Reporting Inc's permission.  CDS did not need StenoScribe Reporting Inc's permission in 1997 when CDS first obtained the name "StenoScribe, Inc."  Nevertheless, Self reported to Tsephanyah Hawkins that he had contacted Ann M. Plainos by phone and was informed by her that she would grant CDS permission to use the name "StenoScribe, Inc.".  Charles C Self, III mailed a written permission letter to StenoScribe, Reporting, Inc. for Ann M. Plainos to sign and return.  It was to be used by CDS to regain its name "StenoScribe, Inc."  Neither CDS nor Tsephanyah Hawkins ever received the signed permission letter.  Instead, Hutchison established a Texas corporation with the name "StenoScribe, Incorporated" on or about October 23, 2003 and used that entity and entity name for her fraudulent purposes and schemes.

137.    Acting on the false and fraudulent pretense that he now could not possibly know to whom the money for the computerized systems previously shipped to NIRR was owed, on or about February 10, 2004, Chistolini represented to Self that Carter and Hutchison were requesting the funds owed to CDS by NIRR.  Chistolini represented that Carter or Hutchison had instructed him to send the funds to them and for him to make the check payable to "StenoScribe, Inc."  Self directed Chistolini to hold the funds until the matter could be resolved. That action was in direct violation of Tsephanyah Hawkins' direct instructions to demand payment from Chistolini. Tsephanyah Hawkins told Self that there was to be no escrow; NIRR and Chistolini knew who or should have known to whom to send the money, and Chistolini should have been ordered to send the money owed to CDS.  It was very apparent before that point that Chistolini was a very dishonest and very dishonorable man.  As a result of Self's failure to follow Tsephanyah

Hawkins' instructions, CDS and Tsephanyah Hawkins suffered damage they would not have suffered otherwise.

138.    On May 13, 2004, Chistolini represented to Self that Chistolini had $84,000.00 in escrow. Chistolini has yet to give a full accounting of same despite demands by CDS.

### *Sales, Concealment, and Profit From Stolen Property*

139.    NIRR exists as a part of Chistolini and Gardner's general business interests to make money for Chistolini and Gardner by selling training to individuals in the use of computerized court reporting systems.  By selling the training, they are able to sell computerized court reporting systems, and by selling the computerized court reporting systems, they are able to sell training for them.

140.    Between October, 2003 and present, Chistolini and Gardner used NIRR to facilitate the sale and distribution of the computerized court reporting systems obtained by means of The Forced Labor Scheme, and the Escrow Scheme described in preceding paragraphs.  They have sold over thirty such systems.

141.    Chistolini and Gardner in their capacities with NIRR, each used income NIRR received from those sales to operate NIRR and market and sell computerized court reporting systems in interstate commerce as a direct competitor with CDS.

142.    Chistolini and Gardner utilized NIRR to intentionally conceal the whereabouts of the computerized court reporting systems obtained by means of The Forced Labor Scheme, and The Escrow Scheme by refusing to reveal the identities of the "students" who purchased the systems from NIRR on pretended "student privacy" grounds, and by causing those "students" to not inform CDS of the location of their systems or their identities.

### *Establishment and Operation of RICOs.*

43

*Hutchison & Oster Establish and Operate Racketeer Influenced Corrupt Organizations that Compete with CDS in Interstate Commerce*

143.    In the months following the signing of <u>The Order Signed on 10-10-2003</u>, Hutchison and Oster moved their ill-gotten gains across state lines and established and operated several business entities with income derived directly or indirectly from their acts comprising The Bank Fraud Scheme, The Escrow Scheme, The Interstate Travel Scheme, The Forced Labor Scheme, and the Software Protection Circumvention Scheme described in previous paragraphs.

144.    Those entities include OtRecord, Vocedit, Inc., South Carolina School of Court Reporting, Inc., SAW, through the fictitious name "Digiware Technogies, Inc." Those entities marketed and sold the computerized court reporting systems, hardware, and software obtained by the Interstate Travel Scheme, and the Forced Labor Scheme, and the Software Protection Scheme as described above in previous paragraphs. They did so by means including but not limited to the following:

> a.  Marketing the software, hardware, and systems and selling them on its websites "digiwaretechnologies.com", and "digiwt.com."
>
> b.  Oster and Hutchison also represented SAW at the August 2004 National Verbatim Reporter's Association where they sold the software, hardware, and systems.

145.    On information and belief including phone calls from customers, information gleaned from websites, etc.., Oster and Hutchison also marketed and sold the systems, hardware, and software under the name "On The Record" through its website "Otrecord.com", and through the corporation Vocedit through its website "vocedit.com", and through "workshops" as recently as October 2, 2005 in Little Rock, Arkansas.  Oster and Hutchison also marketed and sold the

44

systems, hardware, and software obtained by means of the forced labor scheme and the other schemes describe in this complaint through their operation and management of SCSCR.

### *Identity Fraud*

146.   Sometime in 2004, in order to intimidate Tsephanyah Hawkins, and for other reasons, Oster fraudulently and deceptively changed the name on Tsephanyah Hawkins' Sam's Club membership card account, and thereby stole Tsephanyah Hawkins' Sam's membership card account.

147.   Several times since February of 2004, Hutchison telephoned American Electric Power and changed Tsephanyah Hawkins' billing address for his residential electric service to Hutchison's post office box, P.O. Box 417, Schnecksville, PA.   She did that as a means of obtaining information about Tsephanyah Hawkins and as a means of harassing and intimidating him.  She also contacted Valor Telcom with the intent of modifying Tsephanyah Hawkins' billing address for his telephone lines, and did thereby modify Tsephanyah Hawkins' billing address for his telephone lines.

*148.*   In early to mid 2004, CDS attempted to notify potential customers that Hutchison and Oster were marketing unauthorized and pirated versions of CDS's software.  In response to that, Hutchison, by a system of social hacking and identity fraud, intentionally and knowingly caused the shut-down of CDS's website several times and attempted to have CDS's toll free number disconnected.  For several days in mid March of 2004, Claudia Hutchison deceptively and fraudulently represented to Interland, CDS's internet service provider that she was the account holder of the stenoscribe.com server account and that she had forgotten her password.  Once she obtained the password, she was able to delete the website and/or have the technicians at Interland delete or substantially modify the website.